ROBERT R. POWELL, SBN: 159747
**POWELL & ASSOCIATES**
925 West Hedding Street
San Jose, California 95126
T: 408-553-0201 F: 408-553-0203
E: rpowell@rrpassociates.com

Ryan A. Graham, Esq., SBN: 310186
**LAW OFFICES OF RYAN A. GRAHAM, ESQ.**
1049 Havenhurst Dr., No. 510
West Hollywood, CA 90046-6002
Tel.: (323) 792-6377 | Fax: (323) 345-5035
Email: ryan@ryan.law

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANE BEARD, HILDA PEREZ, and N.P., a minor, by and through Guardian ad Litem Donnie R. Cox, | Case No.: _____ |
| Plaintiffs, | **Complaint for Damages** |
| v. | |
| COUNTY OF STANISLAUS, a political subdivision of the State of California, ERIC ANDERSON, APRIL COBBS, MARIELA GOMEZ, DAVID GRANADOS, STEPHANIE HERRERA, SHARI JOHNSON, SHYNELLE JONES, GLORIO SOLORIO, and DOES 1 through 10 | |
| Defendants. | |

Plaintiffs SHANE BEARD, HILDA PEREZ, N.P., C.P., D.P., and V.P. allege as follows:

## JURISDICTION AND VENUE

1.    Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(a)(3), (4), as this civil action poses a federal question, seeking redress under 42 U.S.C. § 1983

for deprivations of rights secured by the United States Constitution. 28 U.S.C. § 1367(a) confers supplemental jurisdiction over Plaintiffs' state law claims.

2.     Venue properly lies in the Eastern District of California, in that the events and circumstances herein alleged occurred in the County of Stanislaus, and at least one defendant resides in the County of Stanislaus.

**PARTIES**

*Plaintiffs*

3.     Plaintiff SHANE BEARD ("BEARD") is a natural person who, at all times pertinent to the events described herein, was a resident of the County of Stanislaus. BEARD is the father of Plaintiff N.P.

4.     Plaintiff HILDA PEREZ ("PEREZ") is a natural person who, at all times pertinent to the events described herein, was a resident of the County of Stanislaus. PERES is the mother of Plaintiff N.P.

5.     Plaintiff N.P. (with BEARD and PEREZ, "Plaintiffs") is a natural person and minor born 2018 who, at all times pertinent to the events described herein, was a resident of the County of Stanislaus. The parents will seek appointment of Donnie R. Cox, Esq., as Guardian Ad Litem for N.P. at or near the time of filing this Complaint.

6.     Defendant COUNTY OF STANISLAUS ("COUNTY") is a political subdivision of the State of California. The Community Services Agency (CSA) is an administrative subdivision of the COUNTY with the stated mission of "protecting children and families and adults and assisting families towards independence and self sufficiency." Within the CSA, the Adult, Child & Family Services Division (CFS), is responsible for discharging the COUNTY's child welfare programs and delivering Child Welfare Services (CWS) to residents within the territorial jurisdiction of the COUNTY. COUNTY has in its employment various social workers (SWs) and supervisors, such as the individually-named defendants identified below.

7.     Defendant ERIC ANDERSON ("ANDERSON") is a natural person who, at all times pertinent to the events described herein, was employed by the COUNTY as an

2

**COMPLAINT FOR DAMAGES**

emergency response SW supervisor and acting under color of state law.

8.   Defendant APRIL COBBS ("COBBS") is a natural person who, at all times pertinent to the events described herein, was employed by the COUNTY as an emergency response SW and acting under color of state law.

9.   Defendant MARIELA GOMEZ ("GOMEZ") is a natural person who, at all times pertinent to the events described herein, was employed by the COUNTY as a SW and acting under color of state law.

10.   Defendant DAVID GRANADOS ("GRANADOS") is a natural person who, at all times pertinent to the events described herein, was employed by the COUNTY as a SW and acting under color of state law.

11.   Defendant STEPHANIE HERRERA ("HERRERA") is a natural person who, at all times pertinent to the events described herein, was employed by the COUNTY as an emergency response SW and acting under color of state law.

12.   Defendant SHARI JOHNSON ("JOHNSON") is a natural person who, at all time pertinent to the events described herein, was employed by the COUNTY as a SW and acting under color of state law.

13.   Defendant SHYNELLE JONES ("JONES") is a natural person who, at all times pertinent to the events described herein, was employed by the COUNTY as an emergency response SW and acting under color of state law.

14.   Defendant GLORIA SOLORIO ("SOLORIO") is a natural person who, at all times pertinent to the events described herein, was employed by the COUNTY as a family maintenance SW supervisor and acting under color of state law.

15.   Defendant DOES 1 through 10 are natural persons who, at all times pertinent to the events described herein, were employed by the COUNTY in a child welfare capacity and were acting under color of state law. The true names and capacities of defendants sued as DOES 1 through 10 are unknown to Plaintiffs and Plaintiffs pray leave to amend to allege the true names and capacities when they are ascertained.
///

**COMPLAINT FOR DAMAGES**

///

## PROCEDURAL REQUIREMENTS

16.   As required by the California Government Claims Act, a claim was presented to the COUNTY on October 13, 2020. The COUNTY rejected the claim on November 24, 2020.

## BACKGROUND: JUVENILE DEPENDENCY and COUNTY POLICIES

### *Juvenile Dependency Principles*

17.   The juvenile court is a branch of the California Superior Court specially authorized to administer the Arnold–Kennick Juvenile Court Law, which establishes procedures for handling child abuse and neglect cases. California Welfare & Institutions Code (WIC or W&IC) §§ 200, 245.  It has ultimate and exclusive authority over what happens to children who are at risk of, or have suffered, abuse or neglect while in their parent's or guardian's care. Section 300 describes the specific situations that provide the legal bases for juvenile court jurisdiction (e.g., physical abuse) and authorizes the court to remove children from the care and custody of their parents if such action is necessary to keep them safe. § 366.26.

18.   California's child welfare system operates on a state-supervised/county-administered model. Each of California's 58 individual counties administers its own child welfare program, while the California Department of Social Services (CDSS) promulgates regulations governing such programs, provides advice, reviews the child protection services provided by every county child welfare system, and ensures compliance with WIC and CDSS regulations. WIC §§ 10550–10553, 10600, 10601.2(a), 10603, 10605, 10800, 16500, 16501(c) and (f), 16520; CDSS MANUAL OF POLICIES AND PROCEDURES, CHILD WELFARE SERVICES, Div. 31 (MPP) § 31-001.1. CDSS also operates the statewide case management system, known as CWS/CMS, used by county agencies and social workers.

19.   Counties are the primary governmental bodies that directly interact with children and families to address child abuse and neglect. Counties perform these

functions through a designated county welfare department, such as COUNTY's CSA and CFS. Within California's child welfare system, Child Welfare Services (CWS) are the major system of intervention of child abuse and neglect. CWS represent a continuum of services. Since 1982, the four traditional components of CWS programs are emergency response (ER), family preservation, family maintenance, and permanent placement.

20.   ER services consist of a 24-hour response system providing the capability to receive and respond to reports of child mistreatment, and counties must maintain a free public hotline for processing such reports. §§ 16501(a)(8), 16504(a); MPP § 31-015. When county hotlines receive a report, an emergency response referral ("referral") is generated. MPP § 31-002(c)(9). Within CWS/CMS, each referral is identified by a unique serial number; each child is also associated with a unique serial number.

21.   The hotline, using criteria from CDSS and their respective county, must then determine whether the referral's allegations warrant an in-person response or can be evaluated out of the system (or "evaluated out")—in which case no investigation occurs. WIC § 16504(a); MPP § 31-002(c)(8), 31-101.3, 31-105. If an in-person response is required, the referral is assigned to an ER-specialized social worker for investigation. Regulations requires the social worker to make in-person contact with the allegedly-abused minor and at least one adult with information about the allegations. MPP §§ 31-125.2 through 31-125.221. Social workers are required to document their investigation in delivered service logs (DSLs), which are stored in CWS/CMS.

22.   At the end of the investigation, the investigating social worker must determine whether the report of abuse or neglect is (1) unfounded, i.e., the report is "determined to be false, to be inherently improbable, to involve an accidental injury, or not to constitute child abuse or neglect, as defined in [Cal. Penal Code §] 11165.6," (2) substantiated, i.e., the report constitutes child abuse or neglect as defined by § 11165.6 "based upon evidence that makes it more likely than not that child abuse or neglect, as defined, occurred," or (3) inconclusive, i.e., the report is determined "not to be

unfounded, but the findings are inconclusive and there is insufficient evidence to determine whether child abuse or neglect, as defined in [§] 11165.6, has occurred." Cal. Pen. Code § 11165.12(a)–(c).

23.   If the allegations are substantiated, the referral is promoted to a case, resulting in further involvement from the county child welfare agency and possible judicial proceedings. If the department decides to remove a child from parental custody, a warrant authorizing the removal is ordinarily required—like any seizures of a person under the U.S. Constitution.

24.   In all cases, however, detention of a child requires the social worker to file a verified juvenile dependency petition in compliance with the WIC §§ 325–342, which initiates legal proceedings to declare the child a dependent of the juvenile court under WIC § 300. Section 300 lists specific situations (e.g., sexual abuse, neglect, caretaker absence) that will bring a child within the jurisdiction of the juvenile court.

25.   The petition must allege the specific subdivision of § 300 supporting jurisdiction; it must contain a concise statement of facts, separately stated, to support the relevant subdivision; it must provide notice of the specific factual allegations against a parent; and it must be verified.

26.   The dependency petition must be filed within 48 hours of the removal of a child from parental custody. Thereafter the juvenile court must also hold a hearing (the "Detention Hearing") to determine whether the child should remain detained, and that hearing must be held by W&IC statutes, no later than the end of the next court day after the petition is filed. In advance of the detention hearing, the child welfare department must file a Detention Report with the juvenile court providing the results of the alleged investigation. Later, the merits of the dependency petition (i.e., whether its allegations are true) are litigated in a "jurisdiction hearing," for which the child welfare agency must file a "jurisdiction report." Other hearings follow, requiring additional reports be filed by the child welfare agency, as the juvenile dependency case winds toward either of two ultimate outcomes: reunification of the family, or else loss of parental rights.

27.   Under federal law, the Petition, the Detention Report, and all filings in a juvenile dependency proceeding, as well as all representations made by agency personnel to the Court must be honest, thorough, and accurate; there is no such thing as a minor amount of actionable perjury or of false evidence that is permissible in juvenile dependency proceedings.

28.   When social workers draft petitions and other juvenile court reports, the information for such reports is drawn from CWS/CMS. For example, when a social worker investigates a referral, s/he is required to record the nature of any interactions with parents or other contacts into CWS/CMS—including what the participants in the interaction states, what the social worker observed, the date of the interaction, participants in the interaction, and the location. Social workers also document internal staff meetings in CWS/CMS. Moreover, when social workers are working in CWS/CMS on a particular case, the database has a feature that permits the social worker to view the entire child welfare history of the child and the alleged abuser. The information in CWS/CMS (and its accuracy) is especially important where the social worker drafting the court reports is not the same social worker who made the initial investigation—as happened in this case.

## *Municipal Policies*

29.   COUNTY has a policy, custom, or practice of including false allegations, exaggerating partially-true allegations into misrepresentations, omitting material facts, and excluding exculpatory information in juvenile dependency petitions, warrant applications, and juvenile court reports (e.g., detention, jurisdiction, and disposition reports) filed by SWs and supporting staff in the juvenile courts that result in the initial, unlawful detention of minor children and the continued detention of such children once juvenile process begins.

30.   COUNTY has a policy, practice, or custom authorizing and/or ratifying without discipline, threat of discipline, or reprimand of social workers and/or their supervisors, the repeated removal of children from their parents or guardians in the

absence of probable cause, without a warrant, consent, or imminent risk of serious bodily injury to children, taking children when there are less intrusive means of protecting them from whatever the SWs' perceived imminent risk of serious bodily injury to the children might be, and for which the result of said policy has been thousands of lawless removals of children from parents and/or the separation of children from parents in Stanislaus County over the past several years. Such policies, practices, and customs result in violations to the Fourth and Fourteenth Amendment rights guaranteed to parents and children. This policy, practice, or custom, has been the moving force behind the removals in the following families known to Plaintiffs: (1) Angelina Nunes and Emanuel Alves (July 2016), (2) Leah and Serena Ford, (3) Jeremy Westfall and Taylor Webb, (4) Leann Santo, and (5) Emannuel and Makeda Wyatt.

31.   COUNTY has a policy and/or unwritten practice or custom of removing all children from a household parents whenever SWs remove a single child from that household ("Take One, Take All" policy). The Take One, Take All policy has resulted in the removal of other children by COUNTY. On May 9, 2018, after the sudden death of one of non-party Leann Santor's children (from natural causes, not abuse or neglect), COUNTY removed her remaining children despite the facts that there was no imminent risk to their health, there was no probable cause to support such removal, and the presence of alternative, less-restrictive means to address whatever concerns CFS claimed it had. The policy also resulted in the removals of children—without probable cause or exigency—from Angelina Nunes and Emanuel Alves (July 2016) and Leah and Serena Ford.

32.   COUNTY has a policy and/or unwritten practice or custom of manipulating the reports written by court ordered therapists and evaluators with the COUNTY contracted providers of numerous "services" that are foisted upon parents by COUNTY in the course of juvenile dependency proceedings, an entity known as "Sierra Vista Child & Family Services."  These reports are then submitted to the juvenile court in juvenile dependency matters, and the social workers do not inform the court or the other

parties of their interference in the independent judgment of the mental health professionals involved, from whom the decisions about the extent and duration of any counseling or therapy are dictated by the non-professional, non-licensed (in most all cases) social workers.

33.   Pursuant to the COUNTY's policies, practices, and customs, the social workers who prepare juvenile dependency petitions are not required to conduct any personal investigation into the facts, legal claims, and allegations of abuse/neglect levelled against the parents that their petitions necessarily must include to initiate dependency proceedings—despite the fact that the petitions must be sworn, under oath and submitted to the juvenile court. The absence of any investigation by social workers these social workers, combined with the routine practice of lying, making material omissions of fact, omitting exculpatory material, and inflating and exaggerating allegations, apply to the petition-drafting process, as well as the processes for drafting other numerous documents in juvenile dependency proceedings. In the context of preparing petitions, this deceptive exaggeration and omission of information that would wholly or significantly refute the allegations contained in the petitions allows CFS to create a leveraged situation for settlement discussions with parents (wherein there are increased opportunities to get the parent or parents to agree to "lesser" charges in exchange for submitting to continued jurisdiction by the juvenile court and therefore continued CFS involvement in the family's lives, and the stream of federal funding that goes along with it), occur as a matter of practice and custom and is but another of the unconstitutional practices and customs of COUNTY.

34.   Plaintiffs allege the COUNTY has failed to train its employees on the scope, nature, and importance of the Fourth and Fourteenth Amendment protections for familial association, issues that arise routinely in child welfare investigations, including, but not limited to the following:

a. the procedural due process right to have notice and the opportunity to be heard;

b. the constitutional rights and liberty interests of a parent to care for his/her child without

unreasonable government interference, and the reciprocal rights of a child to same;

c. the existence and relevance of federal laws and precedent on the removal of children from their parents / guardians in the context of an investigation of a child abuse or neglect referral, and;

d. the prohibition under federal law against the inclusion—within juvenile court filings—of false statements, misrepresentations of evidence, and omitting exculpatory information that may be clarifying or mitigating to one or more allegations or statements of fact for purposes of securing removal, extending juvenile court proceedings, and continued detention during the pendency of such proceedings.

e. The nature and extent of the physical, emotional, and psychological harm that removal of children causes parents and the children, including but not limited to, (1) the permanent and untreatable emotional and  physiological damage to children and life-long sequalae of emotional and psychological instability of children separated from their parent(s), (2) the nature of the aforementioned damage as being physically measurable in regards to physical changes in children's developing brains as seen in the impairment of neurons and neurological receptor conductivity in the brain, and diminished growth of both grey and white matter in their brain, (3) the importance of the parent-child bond that is disrupted by removal and/or separation from parent(s), to the long term behavioral, emotional, and psychological function of [a/the] child[ren] passing through infancy, youth, adolescence and adult hood, and inclusive but not limited to the effect of the child[ren]'s ability to form lasting emotional bonds with friends, family, lovers and spouses, in addition to the panoply of individuals encountered in a lifetime such as teachers, and coaches, pastors, and mentors, for whom children damaged in the way complained of above, cannot learn and grow and achieve their highest and best human achievement because they cannot achieve any semblance of an intimate emotional bond with those individuals, and, (4) the depths of depression, despair, anxiety, anger, and grief visited upon parents of child[ren] removed by COUNTY and the long term effects of that experience on their ability to function emotionally and psychologically, to trust

government authority, and to feel safe and secure in their homes and families.

## FACTUAL ALLEGATIONS

### *The Family*

35.   N.P. (born 2018) is the son of BEARD and PEREZ. Non-party minor A.S. (born 2008) is the child of PEREZ and non-party Alfredo Sosa ("Sosa"). Non-party minors C.P. (born 2005), V.P. (born 2010), and D.P. (born 2008) are the children of PEREZ and non-party Horacio Garcia.

36.   As of July 2019, when these events began, BEARD and PEREZ lived in separate residences. BEARD lived in the home of his parents. N.P. resided primarily with PEREZ.

### *The Referral and Initial Interviews*

37.   On July 12, 2019, a referral was generated. The reporting party alleged the following: (1) A.S. reported that he was touched inappropriately in the shower by V.P., and (2) A.S. reported that V.P. and C.P. hit him on the head, and that his mother did nothing about it.

38.   The referral did not allege that N.P. was the victim of any abuse or neglect, and did not allege that BEARD perpetrated any such abuse or neglect (against N.P. or any other minor).

39.   The referral was investigated by emergency response SWs COBBS and JONES, who responded to PEREZ' home the same day (July 12, 2019) to interview the family. COBBS and JONES memorialized these interviews in their DSLs.

40.   COBBS, JONES, and all of the other individually-named defendant social workers herein were aware that the contact entries they make in CWS/CMS (*i.e.*, the DSLs) are submitted as evidence in juvenile proceedings. They were aware of this well before their involvement with BEARD and PEREZ, and knew the same was true for how the allegations in W&IC § 300 petitions are created by the other social workers responsible for drafting such petitions: those social workers would read, and rely upon, the statements made in the DSLs written by COBBS, JONES, and the other

individually-named defendants. With that knowledge, and as explained below, COBBS and JONES did and do repeatedly lie in their DSLs and omit exculpatory information learned during their investigation from their DSLs, thereby setting in motion a series of events that they know or should know will lead to the violation of the liberty interests of parents and children.

41. In describing the interview with PEREZ, the DSLs state that PEREZ told JONES the following: that C.P. and A.S. were playing a game called "sleepy sleepy," in which one child plays dead (*i.e.*, sleeping) while the other attempts to provoke a response (*i.e.*, wake up); that A.S. told PEREZ that C.P. grabbed him (A.S.) over the clothing; that she (PEREZ) did not witness the incident; and that she had a conversation with the children about inappropriate touching afterward.

42. The DSLs also state that PEREZ told the SWs she had previously taken A.S. to his primary care physician (Dr. Rodriguez) after an incident in which A.S. disclosed—upon returning from a visit with his father on July 10, 2019—that his "bottom" hurt. Dr. Rodriguez, who could not conclude that any abuse occurred. Dr. Rodriguez referred PEREZ to Valley Children's Hospital, where another examination failed to yield any evidence of sexual abuse.

43. Because California law (CANRA) requires medical professionals to report suspected abuse, both of these medical appointments—with Dr. Rodriguez and at Valley Children's Hospital—resulted in referrals being generated on July 10 and 11, 2019. In neither of these referrals did CFS determine that any sexual abuse occurred.

44. The SWs asked PEREZ why she continued to send A.S. to his father's home, despite believing that Sosa had sexually abused A.S. PEREZ emphasized that a court order controlling custody was in place, and that she could not violate it. COBBS and JONES told PEREZ that, if she really cared about her children and believed A.S. was being touched by his father, she should forget about the court order.

45. In her DSLs, COBBS noted the following about PEREZ: "This SW would like that [sic] there are concerns regarding [PEREZ'] ability to be protective as it was

mentioned in previous referral that should [sic] be protective. It appears as [PEREZ] has not been providing her children with adequate supervision as evidenced by her being made aware of inappropriate touching between her children. Additionally, [PEREZ] appears to have minimized the incident by not following through with making appropriate arrangements in her home allowing [A.S.] and [C.P.] to interact with one another without adult supervision."

46.   The observations recorded by COBBS and JONES do not support these conclusions. As PEREZ' statements and CFS' own internal records confirm, PEREZ did take protective action whenever she learned of an allegation of sexual abuse. She took A.S. to several medical facilities after his disclosure about his father; and she addressed the allegations between her two sons the same night.

47.   The only factual observation supplied by COBBS was that PEREZ allegedly "permitted [A.S.] to be in a room with [C.P.] briefly while this investigation was conducted." This is untrue, however. Two of the other children, Destiny (then 18 years old) and Horacio Jr. (then 20 years old), were present in the room.

48.   The SWs also interviewed A.S. and C.P. According to the DSLs, C.P. told JONES about an incident, a long time ago, in which he built a fort in his room with A.S. They began playing tag, running in and out of the fort. A.S. asked C.P. to touch his (A.S) "ding-a-ling." C.P. reported that he began to comply, but stopped—only touching A.S.' belt buckle, stating "I knew it was wrong." C.P. reported that, later that night, PEREZ spoke with C.P. and A.S. about the differences between "inappropriate touching and appropriate game"—*corroborating PEREZ' statements that she took action after learning of the incident.* C.P. further stated that, as he was exiting his mother's room, he overheard PEREZ asking A.S. whether he learned of the inappropriate touching game from his father (Sosa) and whether his father engaged in similar activity. C.P. did not overhear A.S.' response. PEREZ told he SWs she had discussed this with the children.

49.   According to the DSLs, A.S. informed JONES that C.P. did *not* touch him inappropriately in the genital area, but volunteered that "he told his mom that his dad

touched his butt because he wanted her to make him an appointment." A.S. also stated that his father, Alfredo, had punched him in the head previously. A.S. also informed COBBS that his father "did nothing to my butt" and that he did not like going to his father's home because the father forced him to watch scary movies. COBBS described A.S. as "friendly" and having "no difficulties engaging with others."

50.   The SWs also interviewed BEARD. Discussing potential sexual abuse by A.S.' father (Sosa), they told BEARD they had spoken with Sosa and that they did not believe the allegations—stating that A.S. was seeking attention, lying, and attempting to manipulate his mother.

51.   COBBS and JONES then asked BEARD if he knew anything about sexual abuse allegations involving C.P. and A.S. BEARD denied any such knowledge. Next, the SWs asked BEARD if he knew about a game the children played—to which BEARD responded that, yes, he was familiar with the "sleepy sleepy" game. BEARD told the social workers that he knew C.P. had touched A.S.' belt buckle, but that C.P. knew the game was inappropriate and walked away. BEARD also shared that, according to A.S., the game was invented by his father (Sosa).

52.   The SWs asked BEARD why he did not report the incident; BEARD explained that, in his understanding, the only person who committed a reportable act of abuse was Sosa. BEARD asked the SWs why he should report someone (C.P.) who could correctly distinguish inappropriate and appropriate behavior, and who did not actually *do anything*. The SWs were silent.

53.   The SWs also asked BEARD why he chose to live apart from PEREZ; he explained that he simply was not ready for cohabitation at that point in their relationship.

54.   In her DSLs, COBBS wrote that BEARD reported that he was aware of the "sleepy sleepy" game due to PEREZ informing him of the situation. From this, COBBS concluded the following: "This SW would like to note that [BEARD] appears not to be protective as he knew the aforementioned information and failed to be protective of his

son, [N.P.], and he failed [to] notify the CSA agency when he was made aware of this information." Again, COBBS' conclusions about BEARD are not supported by her investigation.

55.  Critically absent from the SWs' investigation is any reference to what, exactly, BEARD failed to protect N.P. *from*. The SWs did not believe the allegations of sexual abuse, so any attempt to fault BEARD for failing to protect N.P. from sexual abuse is obviously insincere and pretextual.

56.  These statements about BEARD's protective abilities would be repeated throughout the juvenile court proceedings in numerous documents filed by several social workers, including GOMEZ and GRANADOS.

57.  Despite the SWs' purported interest in investigating sexual abuse, none of their DSLs disclose whether they ever bothered to investigate the *actual* accusation for which they were dispatched: the allegation that A.S. was touched in the shower by a sibling.

58.  During this home visit, the SWs informed PEREZ that she would need to attend a Team Decision Meeting (TDM), and that PEREZ could bring her support system to the meeting.

59.  Plaintiffs are informed and believe that public child welfare agency workers use TDMs whenever their assessment of safety suggests the need to consider out-of-home care, whether or not with court involvement, and that the goal of a TDM is to intervene early in a case to prevent removal or to ensure children are placed with family whenever possible. If out-of-home care is necessary (as determined exclusively by the social workers), the TDM process is designed to set the stage for collaboration among biological parents, caregivers, and for moving the entire team toward safe reunification. Despite this, the family was never made aware that CFS' was considering out-of-home-care for N.P.

60.  Later in the day, the social workers telephoned the family regarding the TDM. During the conversation, PEREZ asked whether BEARD was required to attend.

1  JONES informed PEREZ that BEARD's presence was not mandatory.

2      61.  Nevertheless, BEARD and his mother made the choice to attend the TDM as

3  part of PEREZ' support system. There was no indication that the TDM concerned N.P.,

4  either at the time of the telephone call or, as discussed below, during the TDM itself.

5                          *Further Investigation*

6      62.  On July 15, 2019, CFS held the TDM, attended by COBBS, ANDERSON,

7  JONES, BEARD, PEREZ, and nonparty Howard Courney (the TDM Facilitator).

8      63.  Courney started the meeting by stating that the meeting concerned the matter

9  of A.S. JONES interjected, noting that PEREZ had other children. In response, Courney

10  asked "Yes, but this is for A.S., correct?" JONES responded in the affirmative.

11      64.  PEREZ was uncomfortable speaking to CFS in the TDM without an attorney

12  and requested one. JONES told PEREZ that obtaining a lawyer would not be useful, and

13  that PEREZ should not bother retaining one. PEREZ also asked CFS for the

14  information/findings on which they were basing their decisions. COBBS and JONES

15  became irate, stating that the TDM was not that type of meeting. They were clearly

16  angered by PEREZ' desire for legal counsel.

17      65.  PEREZ repeated that she desired the presence of an attorney, making the

18  CFS staff even more angry. ANDERSON yelled "I can't help you if you have an

19  attorney here, I can't do anything for you if that's what you're requesting." JONES and

20  COBBS told PEREZ "we will be at your house in an hour to take your kids." The

21  family left the TDM.

22      66.  At no point in the TDM did BEARD believe that his parental rights over

23  N.P. were in jeopardy—based on the purpose for which he attended the TDM (support

24  for PEREZ) or the statements made by the social workers in the TDM.

25      67.  According to COBBS' DSLs, CFS was "unable to mitigate their concerns

26  due [to] lack of family cooperation and engagement."

27      68.  After the TDM, CFS held an internal meeting (a "TAP staffing").

28      69.  Attendees included ANDERSON, GOMEZ, SOLORIO, COBBS, JONES,

**COMPLAINT FOR DAMAGES**

and HERRERA. At the meeting, and as recorded in COBBS' DSLs, those present decided to remove the children due to PEREZ' "lack of cooperation, repeated concerns regarding sexual and emotional abuse, general neglect, and concerns regarding [PEREZ]' mental health." While N.P.'s siblings were to be placed with their respective fathers, N.P. would be placed in protective custody "due to [PEREZ] and [BEARD] lack of cooperation during the scheduled Team Decision Meeting and [BEARD]'s inability to demonstrate a protective capacity regarding the agency's concerns."

70.     Plaintiffs are informed and believe that the purpose of a TAP staffing is to engage in a team assessment and make collective decisions on issues in child abuse investigations, and alleges that the attendees at the TAP staff meeting made a joint decision to remove N.P. from BEARD.

71.     On July 16, 2019, COBBS met with the fathers of V.P., D.P., and C.P. (Horacio Garcia) and A.S. (Alfredo Sosa) in order to offer each a *Safety Plan*, which would permit Garcia and Sosa to maintain custody of their children and avoid the need to detain the children in foster care. That same day, CFS determined that the referral's allegations of emotional abuse were inconclusive, but that the allegations of general neglect were substantiated.

72.     CFS also called BEARD to ask whether he would consider terminating his relationship with PEREZ if it meant BEARD could retain custody of N.P. BEARD was confused, given his understanding that CFS' concerns were limited to A.S. Nevertheless, BEARD replied that, as much as he loved PEREZ, his son was his first priority and that he would do anything for his son. BEARD was told that CFS did not yet know what it would be doing with the other children (besides A.S.).

### *Warrant Application and Removal*

73.     On July 19, 2019, COBBS filed *Application and Affidavit in Support of Protective Custody Order and Order Authorizing Entry into Home* ("Warrant Application") in the juvenile court, seeking judicial authorization to remove N.P. from both PEREZ and BEARD under WIC § 340. COBBs signed the Warrant Application

1  under penalty of perjury.

2      74.   In the Warrant Application, COBBS submits that it is her professional

3  opinion, based on her investigation, that there is probable cause to believe that N.P.

4  should be placed into protective custody under WIC § 340 because "[t]he child's

5  physical environment poses an immediate threat to the child's health or safety and there

6  are no reasonable services available to this worker which, if provided to the child's

7  parent, guardian, caretaker, or to the child, would eliminate the need to remove the child

8  from custody of his or her parent, guardian or caretaker." COBBS further avers that

9  there is probable cause to believe that N.P. is a person described by WIC § 300. As

10  discussed later, the juvenile court granted the Warrant Application, finding in favor of

11  CFS on these issues of probable cause.

12      75.   In support, the Warrant Application provides approximately three pages of

13  information purportedly establishing probable cause. However, this information is

14  riddled with false statements and omissions that were material to the juvenile court's

15  probable cause findings.

16      76.   The Warrant Application omits the following facts:

17  a.   That PEREZ and BEARD lived in separate homes.

18  b.   That BEARD's parents were willing to care for N.P.

19  c.   That BEARD was willing to do whatever necessary to maintain custody of N.P.,

20  notwithstanding his relationship with PEREZ.

21  d.   That PEREZ had taken action once she learned of the fort incident, speaking with A.S.

22  and C.P. about inappropriate touching that same evening. This omission, coupled with

23  COBBS' statement that PEREZ did not make "appropriate reports" regarding the

24  incident, supports a (false) conclusion that the PEREZ-Beard family took no action in

25  response to the incident—lending credibility to CFS' allegation that the family was not

26  protective.

27  e.   The circumstances at the TDM, in which PEREZ was verbally threatened for the simple

28  act of requesting legal representation.

f. That BEARD's presence at the TDM was in the role of a supportive boyfriend, not as the subject of a child welfare investigation.

g. That the TDM exclusively concerned A.S. and no other alleged victim of abuse/neglect.

77.   The Warrant Application falsely states the following information as factual:

a. That the "concern" alleged in the referral "was that [A.S.] had again been exposed to another hospital visit." In truth, the referral alleged that V.P. had inappropriate sexual contact with A.S. in the shower and that A.S. had been hit in the head.

b. That "services were offered in regard to Family Maintenance," but were "never cleared up or hashed out as to whether [PEREZ] would or would not engage," and that a TDM was scheduled due to this "limited engagement." In truth, no services were offered regarding N.P. (before or after the TDM), this TDM did not concern N.P., and it is a factual impossibility to offer family maintenance services in a meeting for a child (N.P.) that was not even a subject of that meeting.

c. That BEARD was "unwilling to engage in voluntary services."

d. That BEARD "was aware of the agency's concerns but failed to be a protective parent, and has made no new plans to remedy the issue." In truth, the only "concerns" of which BEARD was aware involved the allegations of sexual abuse and A.S. He was not aware of any agency concerns vis-à-vis N.P.: the subject of the warrant.

e. That "baby [N.P.] is at risk for emotional abuse, general neglect, and sexual abuse due to his vulnerable age and ambulatory capacity." In truth, N.P. was never at risk for such abuse in any home, as the only victim of alleged abuse/neglect was an entirely different child (A.S.) and the only alleged perpetrators were not present in the home. Sosa did not cohabitate with N.P.; V.P. and C.P. had already been removed from the home with their father. N.P. cannot have been at risk of abuse or neglect at the hands of persons who were not even present in the home.

78.   The Warrant Application misrepresents the nature and volume of the family's child welfare history, making frequent reference to a high volume of prior referrals while omitting material information about the nature of those referrals.

COMPLAINT FOR DAMAGES

Specifically, in the first sentence of the Warrant Application's substantive allegations, COBBS wrote the following: "According to Case Management Systems (CMS) there have been 52 referrals and/or reports regarding concerns since 12-15-2011. The common themes in these episodes and reports has been sexual abuse to Ms. PEREZ' children or relatives, concerns pertaining to Ms. PEREZ' mental health, along with some self-verbalization by Ms. PEREZ that she wanted to kill herself." This generalized presentation of the family's child welfare history makes several material omissions.

a. The Warrant Application omits the fact that none of the referrals in the family's history involved allegations of abuse toward N.P.

b. The Warrant Application omits the fact that many of the referrals were evaluated out without investigation, including referrals generated in January 2012, August 2012, December 2014, September 2016, and July 2017.

c. The Warrant Application omits the fact that many of the referrals are duplicative. For example, when Dr. Rodriguez referred N.P. to Valley Children's Hospital, two referrals were generated—one from each medical provider, as required under CANRA—for a single set of factual allegations: statements from A.S. regarding his "bottom" after returning from a visit with his father.

d. The Warrant Application omits facts concerning the specific factual allegations of these referrals, the relevant classes of abuse/neglect that were alleged (*e.g.*, physical abuse, general neglect, caretaker absence),  the identities of the victims, and the identities of the perpetrators, despite the availability of this information on CWS/CMS.

79.   The Warrant Application falsely suggests that there were *multiple* referrals regarding the allegations that V.P. touched A.S. Specifically, after setting forth the family's child welfare history, COBBS wrote the following: "At current time, I also investigated *more referrals* regarding Ms. PEREZ regarding sexual abuse allegations. During this time, it was alleged that [A.S.] was being inappropriately touched by [V.P.] During this investigation, SW COBBS was made aware of an incident involving [A.S.] being touched inappropriately by [C.P.] while playing a game in a fort made out of

blankets." In truth, this is a single referral. Moreover, the Warrant Application fails to identify the disposition of the original allegation of sexual abuse by V.P. in the shower.

80.   The Warrant Application falsely states that C.P. admitted he touched A.S.' genitalia. Specifically, it states the following: "[C.P.], a minor, admitted that he touched [A.S.] inappropriately. He reported that [A.S.] asked him to touch his 'ding a ling' and he knew that it was wrong, but he continued to do so." In truth, C.P. told social workers that he only touched A.S.' belt buckle and that he *stopped* himself *because* he knew it was wrong. Instead, COBBS suggests that C.P. admitted that he *continued* to touch A.S.' "ding a ling *despite* an awareness that it was wrong.

81.   The Warrant Application states that a supervisor at the TDM asked PEREZ whether she "wanted the meeting or not and she did not want the meeting." It further states that the supervisor told PEREZ "the information we have is concerning and a decision will have to be made by the agency without her input in regards to where her referral/case will need to go," before noting that "[u]nfortunately, without family cooperation and engagement, voluntary services cannot be used to remedy the current issue." This suggests that the meeting was terminated because the family was uncooperative, which is not true: it was terminated because of the verbal abuse and threats made by ANDERSON, COBBS, and JONES in response to PEREZ' simple request for an attorney.

82.   Based on these facts, the Warrant Application requests a protective custody warrant authorizing removal of N.P. from the care of PEREZ and BEARD out of an unfounded concern "that baby [N.P.] is at risk for emotional abuse, general neglect, and sexual abuse due to his vulnerable age and ambulatory capacity."

83.   On July 19, 2019, the Hon. John D. Freeland of the Stanislaus County juvenile court issued a removal order "[b]ased on the application presented to the [c]ourt by the social worker in this matter."

84.   The court found that, as COBBS had submitted, there was (1) "probable cause to believe that the child is, or appears to come, within the description of Welfare

**COMPLAINT FOR DAMAGES**

1   and Institutions Code Section 300" and (2) that there was probable cause to believe that
2   "[t]he child should be placed into protective custody" because "[t]he child's physical
3   environment poses an immediate threat to the child's health or safety and there are no
4   reasonable means by which the child can be protected without temporary removal from
5   the physical custody of the parents or guardians."

6       85.   The court ordered that "a protective custody warrant shall issue for [N.P.]"
7   proof by affidavit having been made before me by April Cobbs that there is probable
8   cause to believe that at the child described herein may have suffered or is at substantial
9   risk of suffering sexual abuse, serious physical abuse or emotional harm or illness."

10                                    *Removal*

11      86.   On July 19, 2019, BEARD received a telephone call from CFS asking if he
12   was at home, as CFS wanted to conduct a home inspection to ensure that BEARD's
13   house was an appropriate one for N.P. to live in. BEARD told CFS that he was home.
14   CFS also called PEREZ, instructing her to come to BEARD's home.

15      87.   Afterward, law enforcement officers came to BEARD's home with COBBS
16   and JONES. JONES informed BEARD that CFS would be removing N.P. BEARD
17   asked why; JONES responded with the words to the effect of "because you failed to
18   protect and did not participate in a TDM."

19      88.   BEARD asked for the warrant and was ignored, and was told that he could
20   "talk to the judge."

21      89.   At some point, the officers attempted to physically push BEARD's sister—
22   who was also present, and *pregnant*. BEARD's father stepped in front of the officer and
23   instructed the officers to leave his property unless they had a warrant. The officers
24   stated words to the effect of "that's not going to happen" and detained BEARD's father
25   in a patrol vehicle. Only after this incident did the social workers and officers provide a
26   copy of the warrant.

27      90.   BEARD became overwhelmed with grief, collapsing to the ground and
28   crying out his son's name, pleading with the social workers not to remove his child.

**COMPLAINT FOR DAMAGES**

Paramedics were dispatched to the home to ensure BEARD did not enter a stress-induced seizure. While the paramedics were treating BEARD, JONES began verbally attacking BEARD—yelling obscenities and making statements like "You had your chance", "You could have had your son", and "This is your fault." The officers and paramedics instructed JONES to cease, but she did not relent.

91.   N.P. was taken from BEARD's custody. BEARD's mother approached JONES in an attempt to learn how to obtain temporary custody of N.P., so that he would remain with family. In response, JONES stated "I don't need to talk to you" before telling BEARD's mother the following: "Your son should really think about who he sleeps with and has a child with – [PEREZ] is older and manipulating him. She is not a good person."

92.   JONES and COBBS left the home without asking about N.P.'s diet. They did not obtain information about his breast milk intake, medical history, or allergies.

*Juvenile Dependency Petition*

93.   On July 23, 2019, GRANADOS and GOMEZ filed a juvenile dependency petition ("Original Petition"), alleging juvenile court jurisdiction under WIC § 300(b) on the grounds that N.P. had suffered, or was at substantial risk of suffering, serious physical harm or illness (1) as a result of the parents' failure to adequately supervise or protect N.P. and (2) by the inability of the parents to provide regular care for the child due to the their mental illness, developmental disability, or substance abuse.

94.   GRANADOS and GOMEZ did not have any personal interactions with BEARD or N.P., and used information gathered by COBBS and JONES, accessible in CWS/CMS, to draft the Original Petition.

95.   The Original Petition falsely states that C.P. admitted he touched A.S. inappropriately, that PEREZ "minimized" the situation between C.P. and A.S., and that A.S. and C.P. were alone in a room together the interviews. As in the Warrant Application, it deceptively describes the family's child welfare history.

96.   In the Original Petition's supporting allegations, the only fact concerning

BEARD is that BEARD was aware of the allegations between A.S. and C.P. but failed to notify CFS. The facts concerning PEREZ allege that she has taken A.S. to multiple doctors to be examined and exposed A.S. to "multiple medical exams for sexual abuse."

97.   Regarding detention, the Original Petition alleges that N.P. was removed "due to Ms. PEREZ and Mr. Beard's lack of cooperation during the scheduled Team Decision Meeting and Mr. Beard's inability to demonstrate a protective capacity regarding the agency's concerns." GOMEZ and GRANADOS did not have personal knowledge of a single factual assertion in the Original Petition and made no effort whatsoever to verify a single fact—routine practice in the COUNTY.

### *Detention Report*

98.   On July 23, 2019, GRANADOS and GOMEZ also filed a detention report ("Detention Report"), in which they recommended to the juvenile court that N.P. "be detained in suitable placement pending future hearings."

99.   The Detention Report falsely states that A.S. was alone with C.P. in a room during the SWs' home visit on July 12, 2019, supporting the false conclusion that BEARD and PEREZ were not protective. In truth, two other adults were in the room. It also falsely states that reasonable efforts were made to prevent or eliminate the need for removal from PEREZ' and BEARD's care, and that pre-placement preventative services were provided but were not effective. In truth, no efforts were made to prevent removal from BEARD, and no services were offered to them at all.

100. As a reasonable adult with no indication of parental unfitness, BEARD is presumed to have the knowledge and intellect to assess a situation and determine if it is something that needs intervention beyond simple parenting, and BEARD had and has zero obligation to contact CFS under law or regulation. BEARD is not a mandated reporter under CANRA.

101. The Detention Report misleadingly states that BEARD was aware of the allegations between A.S. and C.P. but failed to notify CFS.

102. The Detention Report also includes a recitation of the events surrounding the

removal in which it describes BEARD as "very aggressive." It also informs the juvenile court that BEARD's grandfather was detained in a patrol vehicle, and that BEARD had been treated by paramedics on-scene. But it omits facts concerning the officers' conduct that provoked BEARD's grandfather and the SWs' own aggressive and deceitful conduct that resulted in BEARD's medical issue. Without this information, the juvenile court was left with a false, negative impression of the BEARD household, which was material to the findings—at the detention hearing—necessary to order continued detention of N.P.

103. On July 24, 2019, the juvenile court held a detention hearing, in which the juvenile court determined whether N.P. needed continued detention (based on a prima facie showing). The juvenile court ordered N.P. remain detained from his parents' custody. PEREZ' attorney informed the court that N.P. had been fed breast milk exclusively, and that the social workers had refused to accept her offers to provide such milk. The court ordered the social workers to accept such milk and provide it to N.P.'s caretakers.

104. At the hearing, BEARD met JOHNSON and GRANADOS for the first time. JOHNSON spoke to BEARD about visitation.

### *Subsequent Proceedings*

105. When BEARD had his first visit with N.P. in July 2019, BEARD noticed that N.P. had a very extreme diaper rash. N.P. had never had a diaper rash while in the care of BEARD and PEREZ. BEARD also noticed that N.P.'s diaper was saturated with urine, which could be smelled, that N.P. had earwax buildup in his left ear, and that N.P.'s right thumb was missing a chunk of skin, and was red and warm to the touch.

106. On August 16, 2019, GRANADOS and GOMEZ filed an amended juvenile dependency petition ("Amended Petition"). The Amended Petition added a new allegation that CFS' was concerned that PEREZ was present at BEARD's home when CFS made a home visit and allegations concerning BEARD's mental health.

107. No juvenile court order implied—much less indicated—that BEARD and

PEREZ were precluded from spending time together when they wished, doing whatever they wished. This is yet another attempt to hype-up innocuous conduct on the parts of PEREZ and BEARD as though such conduct were egregious or troubling, and this exaggeration is part and parcel of the fraudulent and vindictive "personality" of CFS and its social workers—supporting Plaintiffs' request for punitive damages.

108. A jurisdiction hearing was held in August 2019, and the juvenile case eventually concluded on April 15, 2020.

## DAMAGES

109. As a result of the conduct of Defendants, Plaintiffs suffered severe emotional distress, anxiety, and general damage to their psyches to such an extent as to cause physical manifestations of pain and symptoms of nausea and severe depression. Related symptoms include, but are not limited to, sleeplessness and sleep disturbances, headaches, fatigue, malaise, irritability, inability to focus, a generalized fear of authority figures and social workers, and loss of appetite. The removal and continued separation of BEARD and PEREZ from N.P. caused humiliation, embarrassment, and loss of reputation in the community to BEARD and PEREZ.

110. BEARD and PEREZ are also informed and believe, and thereupon allege, that they were placed on various state and local database registries for perpetrators of child abuse, further damaging their reputation and likely causing damages in the future to their rights of membership, society, community participation, and association.

111. Plaintiffs seek an award of exemplary (punitive) damages under federal law and California Civil Code § 3294 to make an example of and to punish the individually named non-entity defendants in the hope of deterring future conduct of a similar nature.

112. The acts and omissions of the individually-named Defendants complained of herein were malicious, oppressive, borne of deliberate indifference, shocking to the conscience of the reasonable person, and despicable in the extreme, and, as such, entitle Plaintiffs to an award of punitive damages.

## FIRST CLAIM FOR RELIEF

*42 U.S.C. § 1983: Fourth Amendment*

*Unreasonable Seizure by Judicial Deception*

*(N.P. v. Anderson, Cobbs, Gomez, Granados, Herrera, Jones, Solorio)*

113. N.P. incorporates ¶¶ 1–108, inclusive, as though fully alleged herein.

114. The Fourth Amendment to the United States Constitution safeguards the rights of children to be secure in their persons against unreasonable seizures. Social workers violate the Fourth Amendment when they remove a child from parental custody absent a warrant or exigent circumstances, or where a warrant is obtained by judicial deception. To support a judicial deception claim, a plaintiff must establish that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause.

115. A protective custody warrant authorizing detention of a minor from parental custody requires, pursuant to WIC § 340, that the juvenile court find probable cause supporting the following:

a. That the child is a person described in WIC § 300;

b. That there is a substantial danger to the safety or to the physical or emotional health of the child; and

c. That there are no reasonable means to protect the child's safety or physical health without removal.

116. If the false statements identified in ¶¶ 75–82 were purged from the Warrant Application and the omissions identified in ¶¶ 75–82 were supplemented and corrected, the Warrant Application would not have established probable cause supporting the findings required by WIC § 340.

117. COBBS violated N.P.'s Fourth Amendment rights by her own affirmative conduct in drafting the Warrant Application with false statements and omissions that were material to the probable cause findings that resulted in the seizure of N.P.

118. ANDERSON, COBBS, GOMEZ, HERRERA, JONES, and SOLORIO violated N.P.'s Fourth Amendment rights by participating in the joint decision, at the

July 15, 2019 TAP staffing, to place N.P. into protective custody, in the absence of probable cause, on the pretext that BEARD had failed to be protective of N.P.

119. GOMEZ and GRANADOS violated N.P.'s Fourth Amendment rights by requesting continued detention of N.P. in their Detention Report on the basis of the false statements and material omission identified in ¶¶ 99–103.

120. This claim is for both the initial removal of N.P. and his continued detention during the pendency of the juvenile court proceedings, since if the legal proceeding establishing probable cause is tainted and the result is that probable cause is lacking, then the ensuing pretrial detention violates the detained person's Fourth Amendment rights. *E.g.*, *Manuel v. City of Joliet*, --U.S.--, 137 S.Ct. 911, 197 L.Ed.2d 312 (2017).

121. N.P. re-alleges ¶¶ 109–110 as the damages described therein relate to a claim for violation of N.P.'s Fourth Amendment rights.

122. The punitive damages allegations of ¶¶ 111–112 apply to this claim for relief for the violations of N.P.'s rights, as stated.

## **SECOND CLAIM FOR RELIEF**

### *42 U.S.C. § 1983: Fourteenth Amendment/Substantive Due Process*

123. Plaintiffs incorporate ¶¶ 1–108, inclusive, as though fully alleged in each count of this claim.

### *Count 1: Familial Association*

### *(Beard, Perez, N.P. v. Anderson, Cobbs, Gomez, Granados, Herrerra, Jones, Solorio)*

124. The Fourteenth Amendment prohibits states from depriving any person of life, liberty, or property, without due process of law, including the well-established substantive due process right to family integrity/familial association. Parents have a liberty interest in the companionship, care, custody, and management of their children; and children have a protected liberty interest in the companionship and society of their parents.

125. Plaintiffs bring this claim for relief against ANDERSON, COBBS, GOMEZ, GRANADOS, HERRERA, JONES, and SOLORIO for their actions that resulted in the

removal of N.P. from his parents' custody without probable cause, in violation of the Fourth Amendment, which resulted in a derivative violation of the familial association rights guaranteed to Plaintiffs by the Fourteenth Amendment.

126. Plaintiffs re-allege ¶¶ 109–110 as the damages described therein relate to a claim for violations of Plaintiffs' Fourteenth Amendment rights.

127. The punitive damages allegations of ¶¶ 111–112 apply to this claim for relief for the violations of Plaintiffs' rights, as stated.

### *Count 2: Deliberate Fabrication*

### *(Beard, Perez, N.P. v. Cobbs, Jones, Gomez, Granados)*

128. Plaintiffs incorporate ¶¶ 1–112, inclusive, as though fully alleged herein.

129. The substantive protections of the Fourteenth Amendment's Due Process Clause prohibit falsifying information during child abuse investigations that result in the deprivation of a protected liberty interest.

130. COBBS and JONES violated Plaintiffs' Fourteenth Amendment rights by falsifying information in their DSLs and the Warrant Application, which directly resulted in the deprivation of N.P.'s liberty interest in the care and companionship of his parents and the deprivation of his parents' liberty interest in the custody, care, and companionship of his son.

131. GOMEZ and GRANADOS violated Plaintiffs' Fourteenth Amendment rights in precisely the same manner by their falsification of information within the Detention Report, resulting in the continued detention of N.P. from his parents.

132. Plaintiffs re-allege ¶¶ 109–110 as the damages described therein relate to a claim for violations of Plaintiffs' Fourteenth Amendment rights.

133. The punitive damages allegations of ¶¶ 111–112 apply to this claim for relief for the violations of Plaintiff's rights, as stated.

### **THIRD CLAIM FOR RELIEF**

### *42 U.S.C. § 1983: Fourteenth Amendment/Procedural Due Process*

### *Familial Association*

**COMPLAINT FOR DAMAGES**

1

_(N.P., Beard, Perez v. Anderson, Cobbs, Gomez, Granados, Herrera, Jones, Solorio)_

2

134. Plaintiffs incorporate ¶¶ 1–108, inclusive, as though fully alleged herein.

3

135. The procedural due process protections of the Fourteenth Amendment

4

prohibit the government from depriving any person of a protected life, liberty, or

5

property interest—including the protected interest in familial association—in the

6

absence of adequate procedural protections.

7

136. CFS took custody of N.P. from BEARD and PEREZ without any warning.

8

Neither of the investigating SWs (COBBS and JONES) informed BEARD during their

9

interviews that CFS was considering removing N.P. from his custody. None of the

10

participants at the TDM or the TAP staffing informed BEARD that his custody of N.P.

11

was in jeopardy. Without advance warning, BEARD had no opportunity to avoid the

12

removal of N.P.—despite the fact that BEARD was willing to do anything to retain

13

custody of N.P. CFS also took custody of N.P. from PEREZ without any warning, as

14

she was never informed her custody of N.P. was in jeopardy.

15

137. ANDERSON, COBBS, GOMEZ, GRANADOS, HERRERA, JONES, and

16

SOLORIO violated BEARD's, PEREZ', and N.P.'s procedural due process rights by

17

causing N.P. to be detained from his parents' care without adequate procedural

18

protections.

19

138. COBBS and JONES failed to provide notice to BEARD or PEREZ that their

20

custody of N.P. was in jeopardy before N.P. was removed, despite having ample

21

opportunity to do so during their interviews and at the TDM meeting. ANDERSON

22

failed to provide such notice at the TDM.

23

139. Process was further corrupted by COBBS, JONES, and ANDERSON

24

discouraging the family, at the TDM, from seeking legal representation (to which the

25

family was constitutionally entitled). This behavior resulted in PEREZ exiting the TDM,

26

which the SWs subsequently used as a pretext to claim that the family was

27

uncooperative: the same claim that the Warrant Application submits establishes

28

probable cause to remove N.P. from his parents.

140. ANDERSON, COBBS, GOMEZ, HERRERA, JONES, and SOLORIO acted with deliberate indifference to the risk that N.P. would be seized from his parents without adequate procedures by jointly agreeing, at the TAP staffing, to detain N.P. from his parents without first ensuring that proper notice was provided to BEARD, PEREZ, and N.P.

141. Plaintiffs re-allege ¶¶ 109–110 as the damages described therein relate to a claim for violations of their Fourteenth Amendment rights.

142. The punitive damages allegations of ¶¶ 111–112 apply to this claim for relief for the violations of Plaintiff's, as stated.

## FOURTH CLAIM FOR RELIEF

### *42 U.S.C. § 1983: Fourteenth Amendment/Minimal Care*

### *(N.P. v. Cobbs, Jones, Johnson)*

143. N.P. incorporates ¶¶ 1–108 inclusive, as though fully alleged herein.

144. The Fourteenth Amendment requires that, once the state takes custody of a child, the state owe the child, as part of that child's protected liberty interests, reasonable safety, minimally adequate care and treatment, and social worker supervision.

145. COBBS and JONES violated N.P.'s protected liberty interests by (1) failing to ensure that N.P., a breastfed infant, would continue to have access to his mother's breast milk after he was detained, in disregard of the known and obvious risks of doing so, and (2) their acts in refusing PEREZ' offer to provide breast milk for N.P. after he was detained.

146. JOHNSON violated N.P.'s protected liberty interests by failing to ensure that N.P. was safe and cared-for in his foster placement, resulting in diaper rash, urine-saturated diapers, earwax buildup, and a missing chunk of his thumb.

147. N.P. re-alleges ¶¶ 109–110 as the damages described therein relate to a claim for violation of N.P.'s Fourth Amendment rights.

148. The punitive damages allegations of ¶¶ 111–112 apply to this claim for relief

for the violations of N.P.'s rights, as stated.

## FIFTH CLAIM FOR RELIEF

### *42 U.S.C. § 1983: Municipal Liability*

### *(Beard, Perez, N.P. v. County)*

149. Plaintiffs incorporate ¶¶ 1–108 inclusive, as though fully alleged herein, and allege that the policies, customs, and practices, and/or non-existent or inadequate training described herein above in ¶¶ 29–34 generally and as having occurred in the juvenile dependency cases cited in said ¶¶, which same policies, customs, and practices, and/or non-existent or inadequate training were a moving force in the violations complained of herein above with regard to these Plaintiffs' constitutional rights.

150. Plaintiffs allege these policies, practices, customs and training related issues make the COUNTY itself liable for the actions of the individually named social worker Defendants, and Plaintiffs seek to hold COUNTY liable thereon by this Complaint under the theory of law set forth in *Monell v. Dept of Social Services*, 436 U.S. 658 (1978) and its progeny.

151. The polices, practices, customs, and/or the non-existent or inadequate training of COUNTY social workers such as the individually named defendants, were the moving force behind the unlawful detention of N.P. caused by the repeated making of false representations, submission of misrepresentations, and omissions of exculpatory information to the juvenile court during the juvenile dependency proceedings involving the minor.

152. Plaintiffs re-allege ¶¶ 109–110 as the damages described therein relate to a claim for intentional infliction of emotional distress.

## SIXTH CLAIM FOR RELIEF

### *Intentional Infliction of Emotional Distress*

### *(Beard, Perez, N.P. v. Cobbs, Jones)*

153. Plaintiffs incorporate ¶¶ 1–108 inclusive, as though fully alleged herein.

154. The elements of the tort of intentional infliction of emotional distress are: (1)

extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress, (2) the plaintiff's suffering severe or extreme emotional distress, and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

155. COBBS and JONES intentionally inflicted BEARD and PEREZ with emotional distress by the following acts of outrageous conduct:

a. Concealing their intention to seize N.P. from BEARD's and PEREZ' care, misleading the family as to the true purpose of the June 19, 2019 home visit, and failing to provide BEARD or PEREZ the opportunity to retain custody of N.P. before detaining N.P. by surprise;

b. Placing N.P. in out-of-home placement, despite their knowledge that BEARD and his extended family were willing to care for N.P., were able to do so, and had expressed a desire to do so;

c. Being verbally abusive to BEARD and his family during the removal of N.P., resulting in the dispatch of emergency medical services, despite COBBS' and JONES' awareness that BEARD had suffered from depression;

d. Being verbally abusive to PEREZ in the TDM in response to her request for counsel.

156. COBBS and JONES intentionally inflicted N.P. with emotional distress by the following acts of outrageous conduct:

a. Provoking BEARD's family members and verbally abusing BEARD during the removal, elevating an already-stressful situation to an even more stressful one;

b. Placing N.P. in the care of a stranger, rather than his extended family.

157. As a result of the aforementioned outrageous acts, Plaintiffs suffered severe and extreme emotional distress as alleged in ¶¶ 109–110.

158. Plaintiffs re-allege ¶¶ 109–110 as the damages described therein relate to a claim for intentional infliction of emotional distress.

159. The punitive damages allegations of ¶¶ 111–112 apply to this claim for relief

**COMPLAINT FOR DAMAGES**

for intentional infliction of emotional distress.

## SEVENTH CLAIM FOR RELIEF

### *False Imprisonment*

### *(N.P. v. Anderson, Cobbs, Gomez, Granados, Herrerra, Jones, Solorio)*

160. N.P. incorporates ¶¶ 1–108 inclusive, as though fully alleged herein.

161. False imprisonment is the unlawful violation of the personal liberty of another, the interference being absolutely unlawful and without color of legal authority. The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief.

162. COBBS and JONES are liable for false imprisonment due to their personal involvement in the act of detaining N.P. from the custody of his parents without probable cause, exigency, or consent on July 19, 2019.

163. ANDERSON, COBBS, GOMEZ, GRANADOS, HERRERA, JONES, and SOLORIO are liable for false imprisonment due to their joint decision at the TAP staffing to pursue removal in the absence of probable cause, exigency, or consent.

164. Plaintiffs re-allege ¶¶ 109–110 as the damages described therein relate to a claim for negligence.

165. The punitive damages allegations of ¶¶ 111–112 apply to this claim for relief.

## EIGHTH CLAIM FOR RELIEF

### *Bane Act*

### *(Beard, Perez, N.P. v. Anderson, Cobbs, Jones)*

166. BEARD, PEREZ, and N.P. incorporate ¶¶ 1–108 inclusive, as though fully alleged herein.

167. California's Bane Act prohibits persons, whether or not acting under color of law, from interfering—or attempting to interfere—with the exercise or enjoyment by any individual of rights secured by the U.S. Constitution, federal law, California

**COMPLAINT FOR DAMAGES**

Constitution, or California state law by threat, intimidation, or coercion.

168. ANDERSON, COBBS, and JONES berated BEARD and PEREZ at the TDM after PEREZ stated she desired the presence of an attorney, even threatening to remove PEREZ' children that same day. COBBS and JONES acted and spoke aggressively to BEARD and relatives during the removal on July 19, 2019. These acts, combined with the *actual* removal of N.P. in violation of Plaintiffs' Fourteenth Amendment familial association rights, violate the Bane Act.

169. BEARD, PEREZ, and N.P. re-allege ¶¶ 109–110 as the damages described therein relate to a claim for negligence.

170. The punitive damages allegations of ¶¶ 111–112 apply to this claim for relief.

## DEMAND FOR JURY TRIAL

171. Plaintiffs hereby demand a jury trial.

## PRAYER

Plaintiffs respectfully request that the Court:

1.    Award Plaintiffs general, special, and compensatory damages in an amount to be proven at trial;

2.    Award Plaintiffs punitive damages against individually-named Defendants, and each of them, for their extreme and outrageous conduct in complete disregard for the rights of Plaintiffs;

3. Award Plaintiffs statutory damages and/or attorney's fees against all Defendants as allowed by 42 U.S.C. §1988 and C.C.P. §1021.5.


POWELL & ASSOCIATES.


Date: May 24, 2021          .      /S/ Robert R. Powell          .
                            ROBERT R. POWELL, Esq.
                            Attorneys for Plaintiffs